# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>vs.<br><br>CORDELL MALEEC MAYFIELD,<br>　　　　Defendant. | Case No. 24-cr-0094-CJW<br><br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANT'S MOTION TO<br>SUPPRESS** |

_____

## I. INTRODUCTION

On October 23, 2024, Defendant Cordell Maleec Mayfield was charged by a criminal complaint with one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Section 922(g)(1) (Doc. 2.) On November 5, 2024, the Grand Jury charged Defendant with that same offense as well as one count of Possession of a Firearm with an Obliterated or Altered Serial Number in violation of 18 U.S.C. Sections 922(k) and 924(a)(1)(B).[1] (Doc. 14.)

The matter before the Court is Defendant's Pro Se Motion to Quash the Arrest and Suppress Evidence Resulting from Execution of Search Warrant. (Doc. 50.) The Government timely filed a response. (Doc. 51.) The Honorable Charles J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on March 12, 2025. (Doc. 64.) The Government was represented by Assistant United States Attorney Patrick Reinert. Defendant appeared

---

[1] In the Complaint, the felon in possession of a firearm charge, in addition to being a violation of 18 U.S.C. Section 922(g)(1), also alleges a violation of 18 U.S.C. Section 924(a)(8). (Doc. 14.)

1

in person accompanied by stand-by appointed counsel Andrea Jaeger. The Court previously granted Defendant's motion to represent himself and, at this hearing, confirmed his desire to continue doing so. (Docs. 36 & 64.)

At the hearing, the following Government exhibits were admitted without objection:

1. Search Warrant for 4995 8th Avenue, Marion, Iowa Unit A ("the Property" or "Unit A") (Doc. 54, Gov. Ex. 1);

2. Exterior photos of the Property (Doc. 51, Gov. Ex. 2);

3. Audio of interview of T.H. (Doc. 60, Gov. Ex. 3); and

4. Transcript of audio interview of T.H.[2] (Doc. 60; Gov. Ex. 3A).

Defendant failed to file an Inventory of Items to be Suppressed as required by my standing order. However, it appears from Defendant's brief that he seeks to suppress "the firearm, marijuana, and two cell phones" that were seized during execution of the search. (Doc. 50 at 2; *see also* Hr'g Transcript at 14.)

Defendant's exhibits were admitted without objection:

1. Marion Police Department Supplemental Narrative of Officer Paulsen (Doc. 50, Def. Ex. 1[3]);

2. Marion Police Department Supplemental Narrative of Officer Vick (Doc. 50, Def. Ex. 2);

3. Declaration of T.H. (Doc. 50, Def. Ex. 3);

---

[2] Defendant objected that he had not had an opportunity to hear the audio recording prior to the hearing. Ms. Jaeger arranged with the United States Marshals Service to meet with Defendant after the hearing and play it for him. I gave Defendant until March 19, 2025 to file any further objections, but he did not do so.

[3] Defendant's designation of exhibits violates LR 83E: "Each exhibit must be designated with a number or letter, with plaintiffs using numbers and defendants using letters."

2

4.  Return of Service with Marion Police Department Search Warrant Log (Doc. 56 – not marked as an exhibit); and

5.  Search Warrant (Doc. 57 – not marked as an exhibit).

The Government called two witnesses: Sergeant Adam Paulsen and Officer Jamie Arnold, both of the Marion Police Department.  I found them both credible.  Defendant called no witnesses.  Following the hearing, Defendant filed a Supplemental Response Why He is Entitled to a *Franks* Hearing.  (Doc. 69.)

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.    FINDINGS OF FACT

The following facts were established primarily from the hearing testimony of Sgt. Adam Paulsen and the exhibits admitted into evidence.  Sgt. Paulsen has been a City of Marion Police Officer for ten years.

On September 19, 2024, the Marion Police Department Dispatcher ("Dispatch") received a call from B.H. requesting a welfare check of her daughter, T.H., who B.H. believed was being held against her will by Defendant at the Property.  Upon arrival at the Property, Sgt. Paulsen and Officer Vick located T.H.'s vehicle near the door to Unit A, the unit Defendant had rented.  The Property is known to be part of a commercial building with multiple units, A through D.  Each unit appears to have at least one exterior pedestrian door as well as an overhead door.  Unit A is closest to the street.  Unit A has a pedestrian door on the north side closest to the street under the address numbers.  There is also a concrete walkway from the parking lot to this pedestrian door.  (Gov. Ex. 2 at 1 and Paulsen Testimony.)   Walking to the pedestrian door, one would pass the window discussed below.    Unit A also has "roll-up" or overhead doors on the north and east sides.  Sgt. Paulsen understood Unit A was used as an appliance business.

The officers parked on the street and walked up to knock on the pedestrian door to Unit A but received no answer. Sgt. Paulsen noticed a note on the door that provided a phone number. The officers also noticed T.H.'s vehicle parked in the parking lot near Unit A. They proceeded to knock on the doors to the other units and again received no answer. The lights were visible from Unit A and Officer Vick believed he saw movement when the officers first arrived. After knocking again on the door to Unit A, Sgt. Paulsen moved to a nearby window to Unit A, looked in, and saw a man holding what he believed was a red, SCCY handgun. The man was later identified as Defendant. The officers retreated once Sgt. Paulsen observed the handgun.

Officer Vick and Officer Huh, another officer who had recently arrived, activated their vehicles' exterior lights. After a few minutes, the door opened, and Defendant, the man Sgt. Paulsen had seen with the handgun, exited. Sgt. Paulsen asked Defendant if he still had the firearm and Defendant retreated into the building. A few minutes later, Defendant and T.H. emerged from the building and were detained separately. Defendant volunteered that he only had possession of the front part of the building, i.e., Unit A.

Defendant denied knowledge of the firearm. T.H. told law enforcement she was scared of Defendant and his associates and was only there to retrieve her cat. When Sgt. Paulsen was drafting the search warrant application, he apparently spoke with Officer Pope, who told Sgt. Paulsen about a conversation that occurred on a previous service call between T.H. and Officer Clark. (Paulsen Hr'g Test. at 38-40.) More specifically Officer Pope told Sgt. Paulsen that "he knew of a call for service between Officer Clark and T.H. where T.H. talked about trafficking and they believed it was drug trafficking." (*Id.* at 40; *see also* Doc. 54-1, Gov. Ex. 1 at 5.) Sgt. Paulsen did not obtain more details about the alleged drug trafficking.

Sgt. Paulsen called the owner of the building and determined that there was a door between Units A and B, but the owner told Sgt. Paulsen that it should be locked, and Defendant was not supposed to have access to any of the other units.

Dispatch determined that Defendant was a convicted felon. Law enforcement decided to seek a search warrant for Unit A to locate the firearm. Sgt. Paulsen's affidavit supporting the warrant application included a description of the events described above. It also included the following information:

> While speaking to Officer Clark, [T.H.] indicated that the business was not an appliance building and that there was "trafficking" occurring. According to Cordell's criminal history, he has multiple charges for possession of . . . controlled substances.

(Gov. Ex. 1 at 5).

Sgt. Paulsen's report provides the following information about drug trafficking that was not expressed in the warrant affidavit, "While speaking with Officer Pope, he advised that there was recent intel provided about possible drug trafficking involving Cordell." (Doc. 50, Def. Ex. 1 at 14.)

Sgt. Paulsen's affidavit makes no mention of any confidential informant and Attachment C to the warrant application entitled "Informant's Attachment" is marked "N/A." The issuing judge's endorsement is marked "No informant used in this application."

Having obtained a warrant for Unit A, law enforcement searched it but did not locate a firearm, although they found a small amount of marijuana[4] and "countless

---

[4] The marijuana was recovered before the handgun. Defendant attempted but failed to establish at the hearing that the time on the evidence log showed the firearm was found first. (Doc. 56.) However, Sgt. Paulsen testified that the time recorded for an item of evidence being "recovered" is different from when it is found. "Recovery" relates to when an item is marked into evidence. (Paulsen Hr'g Test. at 38.)

5

appliances, washers, dryers, refrigerators, freezers." Law enforcement found one cell phone in the "office bedroom area" and the other on Defendant's person.

Law enforcement also found an unlocked access door to the adjoining Unit B. After Officer Vick tested the door to see if it was unlocked, he looked on the other side to determine if anyone was present. While Defendant was detained, Defendant stated that he rented only Unit A and only had access to Unit A. After a thorough search of Unit A was complete and no handgun had been located, Sgt. Paulsen again spoke with the owner of the building who had access to Unit B. The owner told Sgt. Paulsen that Unit B was his personal unit and gave him permission to search it using the code to Unit B's external door. Officer Vick found a red and blue SCCY 9mm handgun an arm's length inside the door of Unit B, wrapped in a T-shirt. The handgun Sgt. Paulsen described seeing through the window prior to the search was a red SCCY handgun. Sgt. Paulsen testified that he was familiar with the building as a commercial building and had not known it to be anyone's residence.

Finally, Officer Jamie Arnold was called to testify regarding his interview with T.H. on October 9, 2024. Officer Arnold testified that the audio recording of that interview in Government's Exhibit 3 is true and accurate, as is the transcript of the interview, except for redactions where the audio was unintelligible or confidential information was concerned.

### III.    THE PARTIES' ARGUMENTS

Defendant argues first that the search for narcotics was based on "alleged intel that was given to Officer Pope and exceed[ed] the scope of the alleged firearm search." (Doc. 50 at 3.) Defendant is critical that there was no testimony establishing the credibility of the informant regarding drug trafficking.[5] Defendant contends he is entitled

---

[5] Defendant's brief includes a footnote "Mr. Mayfield requests a copy of the affidavit and search warrant." (Doc. 50 at 4.) His subsequent filings show that he received the search warrant and

6

to a *Franks* hearing because the omission of information regarding the veracity and reliability of the "intel" relied upon meets the threshold showing that the affiant recklessly omitted material facts from the affidavit.

Defendant argues that the search of Unit B, where the handgun was located, was unreasonable and warrantless. Defendant asserts law enforcement should have obtained another search warrant before entering Unit B, which was beyond the scope of the warrant.

Although he does not claim Unit A was his home, Defendant seems to argue that the area where Officer Vick and Sgt. Paulsen stood to see in the window was part of the building's curtilage and, therefore, deserving of protection from unreasonable searches. Defendant argues that officers "peeking through the window [ ] was unreasonable under the Fourth Amendment without a warrant." (*Id.* at 8.) Defendant argues the search cannot be justified by consent or any exigency such as officer safety or as part of a community caretaker function; to wit, a welfare check on T.H.

Finally, Defendant asserts that the affidavit in support of the "arrest warrant" was defective. His argument, however, appears to address the sufficiency of the affidavit signed by Officer Jamie Arnold in support of the criminal complaint sworn out before me on October 23, 2024. (Doc. 2.) The crux of Defendant's argument relates to paragraph 9 of the Complaint:

> On October 9, 2024, the female who was with MAYFIELD was interviewed. The female said that on September 19, 2024, they heard some noises and MAYFIELD grabbed what looked like a gun. The female said MAYFIELD was pointing it around. She stated she did not see what

___

its return of service after his motion was submitted. (Docs. 56 and 57.) This may explain why the Defendant's description of the warrant more closely resembles the officers' reports than the warrant application itself. The warrant application itself does not mention any "informant," but instead refers to information received from T.H. Nevertheless, at the hearing, when questioned about this, Defendant indicated that the "informant" and "intel" he was concerned about was T.H. and the information she provided law enforcement. (Hr'g TR at 8.)

MAYFIELD did with the firearm before they went outside to meet with the officers.

(*Id.*) Defendant argues that Officer Arnold omitted information from that interview as follows: "[T.H., the female in the affidavit,] did not say she saw Mr. Mayfield with the firearm before they went outside. When questioned whose firearm it was, [T.H.] told Jamie Arnold whose she believed it was and was attacked in her home for implicating someone else." (Doc. 50 at 10.) Defendant has offered the affidavit of T.H. in support of his position. The affidavit states in pertinent part:

> 11. The officer asked about where a gun was and I said what gun?
> 12. The officer said he saw Cordell had a gun in his hand and I said I seen him pick something up, but didn't see it. I was scared that someone was breaking in the building.
> . . .
> 15. I never told Jamie Arnold that I saw Cordell with a gun.
> 16. I told Jamie Arnold whose gun it was.

(Doc. 50, Def. Ex. 3 at 22.) Defendant argues the omission of these statements from the affidavit in support of the criminal complaint[6] render the arrest warrant invalid under *Franks*.

In response, first, the Government argues that the search warrant need not disclose every source of information relied upon by law enforcement and that information supplied was sufficiently corroborated. Second, the Government argues that Defendant has no reasonable expectation of privacy in Unit B where the firearm was found and where the owner consented to the search.

Next, the Government contends it was lawful for the officers to enter onto the Property for a welfare or "wellness" check. The Government asserts that the Property is commercial and, therefore, Defendant's reliance on the protection afforded a home's

---

[6] Again, I read Defendant's argument about the "search warrant" to relate to the affidavit supporting the criminal complaint.

8

curtilage is inapposite. Even if the area by the window was deemed part of the curtilage, the Government asserts officers were legally permitted to be there when they saw Defendant with a handgun in plain view. The Government contends Defendant misreads *Caniglia v. Strom*, 593 U.S. 194 (2021) when he argues it prohibits entry onto a commercial property for a welfare check in response to such a report. The Government also points out that under *Caniglia*, officers are permitted, like private citizens, to approach a home and knock. The Government maintains that unlike *Caniglia* the officers made no warrantless entry into the structure.

Finally, the Government argues even if *Franks* could be applied to the criminal complaint affidavit, any omission is moot because of the Grand Jury's indictment. The Government contends that even if the allegedly erroneous information about what T.H. saw was removed or corrected, the affidavit sufficiently supported the necessary elements of the offense, i.e., that Defendant was seen in possession of a firearm and he was known to be a felon.

In his post-hearing brief, Defendant argues that Sgt. Paulsen omitted material facts and was reckless with regard to the truth. He identifies the following alleged errors or omissions, "One being that there was never a red gun or a gun for that matter in Mayfield's hand. Again, testimony from the witness [presumably T.H.] states on record that she never saw Mayfield with a gun nor did she ever see he [sic] go to the back of the building." (Doc. 69 at 4.)

Finally, Defendant argues the judge issuing the warrant abandoned his role by issuing the warrant knowing officers had violated Defendant's Fourth Amendment rights by looking through the window.

9

## IV. DISCUSSION

### A. Is Defendant entitled to a Franks hearing regarding the Search Warrant?

#### 1. Relevant Law

Under *Franks v. Delaware*, 438 U.S. 154 (1978), an affidavit in support of a search warrant is presumed valid. *Id*. at 171; *see also United States v. Randle*, 39 F.4th 533, 537 (8th Cir. 2022); *United States v. Hollis*, 245 F.3d 671, 673 (8th Cir. 2001). A defendant is entitled to a hearing under *Franks* when he or she "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56; *see also United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022) ("To receive a *Franks* hearing, 'a defendant must make a substantial preliminary showing that there was an intentional or reckless' omission from a warrant affidavit that 'was necessary to the finding of probable cause.'") (Quoting *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008)). "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *Hansen*, 27 F.4th at 637 (quoting *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015)). Indeed, "[a] mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. Short*, 2 F.4th 1076, 1080 (8th Cir. 2021) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)).

To make a showing of reckless disregard for the truth, the defendant must show that the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he reported. *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d

10

1195, 1200 (8th Cir. 2015)). "Recklessness can be inferred from [an] omission 'when the material omitted would have been clearly critical to the finding of probable cause.'" *Id*. (quoting *Conant*, 799 F.3d at 1200). If the defendant fails to make "a 'strong initial showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

If a defendant can make the requisite preliminary showing to warrant a *Franks* hearing, then at the *Franks* hearing, the defendant must establish: "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining contents is insufficient to establish probable cause." *Conant*, 799 F.3d at 1199 (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). A similar analysis is employed for omissions. "The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Conant*, 799 F.3d at 1200 (quoting *Reinholz*, 245 F.3d at 774). "[N]egligence or innocent mistake is not enough to establish a *Franks* violation." *Freeman*, 625 F.3d at 1050-51 (quoting *United States v. Butler*, 594 F.3d 955, 961(8th Cir. 2010)). Only if the defendant can meet this burden will the "search warrant . . . be voided [under *Franks*] and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Butler*, 594 F.3d at 961.

### 2. Application

Defendant has not made the necessary showing entitling him to a *Franks* hearing. Defendant's argument that the search warrant was "based on hearsay" and exceeded the scope of the firearm search because there is "no testimony as when this alleged intel was received, from who, when, and what was the alleged drug trafficking" is without merit.

11

(Doc. 50 at 3.)  In fact, the search warrant affidavit does contain "the who, when, and what."  The search warrant affidavit provides:

> On 09/12/2024, Officer Clark spoke with [T.H.] at 4995 8th Avenue, Marion, Iowa, 52302 reference to a burglary.  While speaking to Officer Clark, [T.H.] indicated that the business was not an appliance building and that there was "trafficking" occurring.  According to [Defendant's] criminal history, he has multiple charges for possession of . . . controlled substances.

(Gov. Ex. 1 at 5.)  Here, "the who" is Defendant's girlfriend, T.H.  The "when" was September 12, 2024, when a Marion police officer (Officer Clark) spoke with T.H. regarding a prior burglary at the building that was going to be searched.  The "what" was T.H. telling Officer Clark that the building to be searched was not used for selling appliances but instead was used for drug trafficking.  In his affidavit, Sgt. Paulsen also noted that drug trafficking would be consistent with Defendant's prior history of multiple charges for possession of controlled substances.  The foregoing information along with the other pertinent information in the search warrant affidavit, particularly Sgt. Paulsen observing Defendant holding a firearm and Defendant's criminal history indicating that he was a convicted felon, was sufficient for the issuing magistrate to find probable cause to issue the warrant.  *See United States v. Kucharo*, 127 F.4th 1152, 1158 (8th Cir. 2025) ("Probable cause requires a 'fair probability that contraband or evidence of a crime will be found in a particular place.'") (Quoting *United States v. Espinoza*, 9 F.4th 633, 635 (8th Cir. 2021)).  Moreover, the Government correctly points out that if the information regarding drug trafficking was excised from the warrant, probable cause to search for the firearm remained which would have allowed officers "to look in all places where a firearm could be located, and if the marijuana was discovered, it could be seized as contraband in plain view."  (Doc. 51-1 at 6 n.5.)  *See Horton v. California*, 496 U.S. 128, 133 (1990) ("The 'plain-view' doctrine is often considered an exception to the

general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy.") (citing *Arizona v. Hicks*, 480 U.S. 321, 325 (1987); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)).

Additionally, to the extent that Defendant argues that the search warrant affidavit failed to "demonstrate the informant's veracity," such argument is misplaced. (Doc. 50 at 4.) It is true that an affidavit which is "based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." *United States v. Oliver*, 950 F.3d 556, 564 (8th Cir. 2020) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). Here, however, the affidavit is not based solely on information from an informant. The affidavit is based on Sgt. Paulsen's observation of Defendant holding a firearm and information from a prior burglary investigation where Defendant's girlfriend told law enforcement that Defendant was involved in drug trafficking. *See* Gov. Ex. 1. T.H.'s identity was disclosed in the warrant affidavit by stating that Defendant is T.H.'s boyfriend.

Attachment C to the Warrant Application is entitled "Informant's Attachment." (Gov. Ex. 1, Doc. 54-1 at 6.) In this instance, the form was left blank except to indicate it was "N/A." (*Id.*) The form could be used to provide additional information to provide further information about the reliability of either a "named person" or a "confidential informant." There was no testimony regarding why Sgt. Paulsen marked this form "N/A." However, to the extent T.H.'s provision of information makes her an "informant," law enforcement was reasonable in relying on information she provided as stated in the main body of the affidavit. In *United States v. Solomon*, the Eighth Circuit found the facts that an informant had lived in the same house with the defendant and had

seen incriminating physical evidence created "an exceptionally strong basis of knowledge" that evidence would be found in the home. 827 432 F.3d 824, (8th Cir. 2005.) Thus, even if T.H. is not an "informant" in the sense of a "confidential source" or "confidential informant," the affidavit contained indicia supporting the reliability of the information she supplied. Here, it was reasonable to rely to some extent on the statements of T.H. who was known to be in a relationship with Defendant and who had been in Unit A immediately prior to the search. In other words, this information created a reasonable basis to rely on her statements regarding drug trafficking. But law enforcement did not rely solely on T.H.'s statements. Sgt. Paulson corroborated that Defendant had a criminal history involving multiple charges for possession of controlled substances. *See United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013) ("[E]ven the corroboration of minor, innocent details can suffice to establish probable cause.") (Quoting *Solomon*, 432 F.3d at 828).

**B.**    ***Whether Defendant has Standing to challenge the Search of Unit B***

Defendant's contention that the warrantless search of Unit B was "unreasonable" and in violation of the Fourth Amendment is without merit. (Doc. 50 at 5-7.) Defendant had no reasonable expectation of privacy in Unit B. *See United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) ("Only those with a reasonable expectation of privacy in the place searched may bring a Fourth Amendment challenge."). In general, "[a] defendant who 'fails to prove a sufficiently close connection to the relevant places or objects searched [ ] has no standing to claim that they were searched . . . illegally.'" *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). Factors for determining standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence

14

of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id*. Here, Defendant's lease was for Unit A only. Defendant did not own Unit B. Defendant had no possession or control of Unit B. Defendant did not regulate access to Unit B. Thus, under the totality of the circumstances, I find that Defendant had no reasonable expectation of privacy to Unit B and lacks standing to challenge the search of Unit B. Moreover, the owner of Unit B gave officers consent to search Unit B. *See United States v. Cross*, 888 F.3d 985, 989 (8th Cir. 2018) ("The general prohibition against warrantless entry into a home does not apply 'to situations in which voluntary consent has been obtained . . . from the individual whose property is searched[.]'") (Quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).

Finally, Defendant places too much weight on the color of the firearm, or at least on some discrepancy about its color that he thinks he has uncovered. Sgt. Paulsen's report states, "I believed the handgun to be read [sic] in color and believed it to be an SCCY" when he looked through the window. (Doc. 50 at 13.) His report later states that officers recovered a "red and blue SCCY 9mm handgun." (*Id.* at 14.) Sgt. Paulsen's affidavit in support of the search warrant merely refers to Defendant "holding a firearm (handgun)." (Gov. Ex. 1, Doc. 54-1 at 5.) The absence of further details about the handgun's brand or color in the affidavit does not destroy probable cause. On the contrary, providing the additional details known to Sgt. Paulsen (i.e. the brand and color of the handgun) may have increased the issuing judge's confidence in the observation, but there is no requirement an affidavit include every fact known to the affiant. Moreover, there is no inherent discrepancy. Ultimately, law enforcement found a blue and red handgun. Sgt. Paulsen's affidavit included an accurate subset of the characteristics he observed, i.e., a handgun. His report describes a red SCCY handgun, also a description which includes an accurately described a subset of the characteristics

of the firearm recovered. The fact it proved to also have blue color is no more relevant than any other adjective that might more particularly describe it. Moreover, the fact that the handgun later recovered turned out to be both red and blue does nothing to change the probable cause analysis faced by the issuing judge.

**C.      *Whether the Officers' Pre-warrant Approach to Unit A was Unconstitutional***

Defendant's argument that "the wellness check was unconstitutional" appears to be based on (1) Defendant's contention that the area where Officer Vick and Sgt. Paulsen stood to look in the window was part of the building's curtilage and, therefore, deserving of protection from unreasonable searches; and (2) Defendant's belief that a warrantless entry into Unit A cannot be justified by the officers' community caretaker function, i.e., the welfare check on T.H. (Doc. 50 at 7-10.)

Defendant's first assertion is also without merit. While neither the parties nor I have found an Eighth Circuit case addressing the issue of the alleged curtilage of a commercial property under the Fourth Amendment, the Second Circuit Court of Appeals has addressed it.

In *United States v. McKenzie*, 13 F.4th 223 (2d Cir. 2021), DEA agents were investigating the defendant for drug trafficking where packages of cocaine and marijuana were picked up by two individuals from UPS mailboxes and transported to storage units controlled by the defendant. *Id*. at 228. The storage units were enclosed by a fence and security gate in an open-air area. *Id*. In surveilling the storage units, the DEA agents observed an individual place multiple packages in a storage unit. *Id*. The agents called in a drug dog and the dog alerted on the storage unit. *Id*. The agents obtained a search warrant for the storage unit. The defendant moved to suppress the evidence found during the search, and among other things, the district court denied the motion to suppress, finding that the "dog sniff outside [the storage unit] was not a search within the meaning of the Fourth Amendment." *Id*. at 230. The Second Circuit noted that "[a] canine sniff

outside a residence can be considered a search within the meaning of the Fourth Amendment[.]" *Id*. at 232. As an example, the Second Circuit pointed out that "in *Jardines* the Court found that the canine sniff performed on the curtilage of the defendant's freestanding home was a physical intrusion on a protected property interest under the baseline test. 569 U.S. at 4–6, 133 S.Ct. 1409" and the "location of the dog was determinative, not the particular method (the dog's sensitivity to a substance's odor) of the search. [*Jardines*, 569 U.S. at 4-6]." *Id*. However, unlike in *Jardines*, the Second Circuit explained that the storage unit "is not a home." *Id*. The Second Circuit stated:

> While the Fourth Amendment applies to businesses and offices (and storage units), *see See v. City of Seattle*, 387 U.S. 541, 543, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the Court has not extended the concept of curtilage and its Fourth Amendment protections to commercial property. *See Dow Chemical Company v. United States*, 476 U.S. 227, 236, 239, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (finding that open areas of a large industrial plant complex were not analogous to the curtilage of a dwelling for purposes of aerial surveillance). In *United States v. Dunn*, the Court identified the "centrally relevant consideration" for "extent-of-curtilage questions" as "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). When one rents a storage unit, no curtilage comes with it.

*Id*.

I find the reasoning in *McKenzie* persuasive. Here, while not a storage unit, Unit A was part of a commercial building and Defendant used Unit A to store and sell appliances. Unit A has a pedestrian door with a concrete walkway from the public parking lot to this pedestrian door. (Gov. Ex. 2 at 1 and Paulsen Testimony.) Sgt. Paulsen's reasonably believed that Unit A is not a home and Defendant does not assert Unit A is a home, let alone his home. Thus, "no curtilage comes with it" and no Fourth Amendment violation occurred when Officer Vick and Sgt. Paulsen looked in Unit A's window. *Id*.

Similarly, Defendant's argument about the welfare check is also without merit. First, Unit A is not a home, it is a commercial building. Second, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citing *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *see also Georgia v. Randolph*, 547 U.S. 103, 118 ("[I]t would be silly to suggest that the police would commit a tort by entering . . . to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur"). Third, officers may also "generally take actions that '"any private citizen might do"' without fear of liability" such as "approaching a home and knocking on the front door." *Caniglia v. Strom*, 593 U.S. 194, 198 (2021) (quoting *Jardines*, 569 U.S. at 8). Here, Officer Vick and Sgt. Paulsen were performing a welfare check on T.H. based on a call from T.H.'s mother who was concerned that Defendant would not let her daughter leave Unit A. It was not a Fourth Amendment violation for the officers to approach and knock on the door to Unit A, a commercial building not a home, to investigate whether T.H. was injured or in imminent danger. Thus, even if the Court concludes that a commercial building (or at least this commercial building) has curtilage, the officers' approach to the door within that curtilage is every bit as justified as that of any citizen who walks up to knock on a door. The observation of the firearm from this vantage point and under these circumstances did not violate any legitimate expectation of privacy.

Finally, Officer Vick and Sgt. Paulsen did not make a warrantless entry into Unit A. Officer Vick and Sgt. Paulsen only entered Unit A after Defendant and T.H. had exited Unit A and after law enforcement had obtained a search warrant for Unit A. Based on the foregoing, I find that the officers' pre-warrant approach to Unit A did not violate the Constitution.

***D.***     ***Defendant's Challenge to the Arrest Warrant***

    Finally, Defendant's argument that, under *Franks*, the affidavit in support of the "arrest warrant" was defective, *see* Doc. 50 at 10-11, and appears to address the sufficiency of the affidavit signed by Officer Jamie Arnold in support of the criminal complaint sworn out before me on October 23, 2024, *see* Doc. 2, is of no avail. Defendant's charges stem from an Indictment by a Grand Jury. (Doc. 14.) While Defendant's charges were initiated by a criminal complaint (Doc. 2), any deficiencies in the complaint affidavit have been rendered moot. The Supreme Court has explained that:

> This Court has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime. *See*, *e.g.*, *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 100 L.Ed. 397 (1956). "[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,'" we have explained, "conclusively determines the existence of probable cause" to believe the defendant perpetrated the offense alleged. *Gerstein v. Pugh*, 420 U.S. 103, 117, n. 19, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (quoting *Ex parte United States*, 287 U.S. 241, 250, 53 S.Ct. 129, 77 L.Ed. 283 (1932)). And "conclusively" has meant, case in and case out, just that. We have found no "authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof." *Costello*, 350 U.S., at 362–363, 76 S.Ct. 406 (quoting *United States v. Reed*, 27 F.Cas. 727, 738 (No. 16,134) (C.C.N.D.N.Y.1852) (Nelson, J.)). To the contrary, "the whole history of the grand jury institution" demonstrates that "a challenge to the reliability or competence of the evidence" supporting a grand jury's finding of probable cause "will not be heard." *United States v. Williams*, 504 U.S. 36, 54, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (quoting *Costello*, 350 U.S., at 364, 76 S.Ct. 406, and *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)). The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.

*Kaley v. United States*, 571 U.S. 320, 328 (2014). Moreover, after a defendant has been indicted, *Franks* is not the proper vehicle for challenging a complaint affidavit. *See*

*United States v. Sole*, No. 2:23-CR-00015-GSL-JEM, 2025 WL 26690, at *3 (N.D. Ind. Jan. 3, 2025) (finding that the defendant "did not effectively challenge the probable cause affidavit at the probable cause hearing, so the attempt to do so now under the banner of Franks, which concerns search warrants, is improper" and noting that the defendant "could have raised these defects at any time before the grand jury indictment, which 'obviates any need for a criminal complaint'") (quoting *United States v. Gerebizza*, 720 Fed.Appx. 302, 305–06 (7th Cir. 2017), in turn citing Fed. R. Crim. P. 3, 7).

Based on all the foregoing, I find that Defendant has failed to make the requisite showing necessary for a *Franks* hearing and I find that Defendant's other Fourth Amendment arguments are without merit. Accordingly, I recommend that Defendant's motion to suppress be denied.

## E.     *The Good Faith Exception Under* Leon

### 1.     *Relevant Law*

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

*Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

### 2. Application

None of the four scenarios contemplated by *Leon* apply here. Indeed, there is no evidence that the affidavit in support of the search warrant contained any false statements or that the issuing magistrate judge was misled in any way. There is no evidence that the

21

issuing magistrate judge "wholly abandoned" his or her judicial role in issuing the search warrant. Defendant argues that the issuing judge abandoned his or her role by issuing a warrant knowing law enforcement had looked in the window. Because I have concluded this was not a constitutional violation, I cannot now say the issuing judge abandoned his or her role by ignoring this behavior. Even if the Court disagrees with me on this point, the violation was not so obvious that the judge abandoned his or her role by issuing the warrant.

As discussed above, based on the affidavit in support of the warrant application, the issuing judge had a substantial basis and made "a practical and common-sense" determination, based on the totality of the circumstances, that "a search would uncover evidence of wrongdoing"; and therefore, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Kail*, 804 F.2d at 444; *Maccani*, 49 F.4th at 1130; *Proell*, 485 F.3d at 431. Indeed, the warrant affidavit contained information from Defendant's girlfriend, T.H., who prior to the incident in this case, on September 12, 2024, told a Marion police officer (Officer Clark), regarding a prior burglary at Unit A, that Unit A was used for drug trafficking, which was consistent with Defendant's prior history of multiple charges for possession of controlled substances. The warrant affidavit also contained Sgt. Paulsen's observation of Defendant holding a firearm when he and other officers performed the welfare check at Unit A and also contained information that Defendant's criminal history provided that he was a convicted felon. Finally, there is no allegation or evidence that the warrant is "so facially deficient" that a police officer could not reasonably presume that the warrant was valid. Thus, I find that Sgt. Paulsen's and Officer Vick's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id*. Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

22

*F.*    *T.H.'s statements*

Defendant offered into evidence a Declaration of T.H. (Doc. 50.) The declaration itself is undated, but it describes the events of September 19, 2024, an interview in the hospital by Officer Jamie Arnold on October 9, 2024, and an attack on T.H. "[a]bout month [sic] or so after the interview." (*Id.*) The Government's recording of the interview and the transcript are also not dated. Nevertheless, it is clear from the content of the declaration, the interview recording, and the transcript that all the statements contained in these exhibits were uttered by T.H. well after the search warrant was issued on September 20, 2024.

Neither party has clearly stated what the Court is supposed to do with these statements. Presumably Defendant contends these statements support his *Franks* argument. Indeed, Defendant's only mention of T.H.'s declaration is to support his contention that the affidavit supporting the criminal complaint is defective because it omitted her statements. For the reasons discussed in section D above, any dispute about the sufficiency of TFO Arnold's affidavit in support of the complaint was rendered moot by the return of the indictment by the grand jury.

If the Defendant is urging the Court to consider T.H.'s declaration for the broader purpose of casting doubt on the search warrant application or creating a basis for a *Franks* hearing, the argument is rejected. Even if the Sgt. Paulsen's search warrant affidavit excluded all T.H.'s statements, the affidavit nevertheless contained probable cause for the search based on Sgt. Paulsen's personal observation of the firearm and his knowledge that Defendant is a felon. Moreover, if the affidavit included T.H.'s statements about the firearm from the night of the incident, it still does not affect the existence of probable cause. She stated, "The officer said he saw Cordell had a gun in his hand and I said I seen him pick something up, but I didn't see it." Ultimately there is nothing in T.H.'s

declaration known to her at the time of the search warrant that would change the finding of probable cause.

## V.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Pro Se Motion to Quash the Arrest and Suppress Evidence Resulting from Execution of Search Warrant.  **(Doc. 50.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation.  Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Crim. P. 59.  Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein.  *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir.  2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 1st day of April, 2025.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa