## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 24-CR-94-CJW-MAR |
| Plaintiff, | |
| vs. | **ORDER** |
| CORDELL MALEEC MAYFIELD, | |
| Defendant. | |

### I.     INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 72) by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending the Court deny defendant's pro se Motion to Quash the Arrest and Suppress Evidence Resulting from Execution of Search Warrant (Doc. 50).

On October 23, 2024, defendant was charged by a criminal complaint with one count of Possession of a Firearm by a Felon in violation of Title 18, United States Code, Section 922(g)(1). (Doc. 2). On November 5, 2024, the grand jury returned an Indictment charging defendant with that same offense[1] as well as one count of Possession of a Firearm with an Obliterated or Altered Serial Number in violation of Title 18, United States Code, Sections 922(k) and 924(a)(1)(B). (Doc. 14).

On February 24, 2025, defendant filed his pro se Motion to Quash the Arrest and Suppress Evidence Resulting from Execution of Search Warrant. (Doc. 50). Defendant's motion failed to comply with Judge Roberts' Standing Order which requires, under a separate heading, an Inventory of Items to be Suppressed. As Judge Roberts notes in his

---

[1] Count One of the Indictment alleges defendant violated Section 922(g)(1) along with the corresponding penalty provision of Section 924(a)(8). (Doc. 14).

R&R, however, it appears defendant seeks to suppress "the firearm, marijuana, and two cell phones" that were seized on September 20, 2024, during a search of a commercial building housing an appliance shop operated by defendant at 4995 8th Avenue, Unit A, in Marion, Iowa ("the Property"). (Docs. 50, at 2; 72, at 2). The government timely filed a resistance to defendant's motion. (Doc. 51).

On March 12, 2025, Judge Roberts held a hearing on the motion. (Doc. 64). On March 20, 2025, defendant submitted a pro se "Supplemental Response Why He is Entitled to a *Franks* Hearing." (Doc. 69). On April 1, 2025, Judge Roberts issued his R&R, which recommended the Court deny defendant's motion. (Doc. 72).[2] On April 16, 2025, defendant timely filed his pro se Objections to the R&R. (Doc. 80). On May 28, 2025, defendant filed a supplement to his Objections. (Doc. 122).

For the following reasons, defendant's Objections (Doc. 80) are **overruled**, the R&R (Doc. 72) is **adopted**, and defendant's Motion to Quash the Arrest and Suppress Evidence Resulting from Execution of Search Warrant (Doc. 50) is **denied**.

## II.   STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions

---

[2] Also on April 1, 2025, defendant filed a pro se supplement to his request for a *Franks* hearing. (Doc. 71). This filing contains only a duplicative copy of the main body of Sgt. Paulsen's affidavit that he attached to his application for the September 20, 2024 search warrant. The government submitted Sgt. Paulsen's affidavit at the suppression hearing as government Exhibit 1, and Judge Roberts considered it in his R&R. *See* (Docs. 54-1, at 5; 64, at 2). Thus, defendant's supplemental filing adds nothing to the Court's analysis of Judge Roberts' R&R.

of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the Court reviews the disputed portions of the Report and Recommendation de novo.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A district judge may, however, elect to review an R&R under a more exacting standard even if no objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985).

### III. DISCUSSION

Defendant does not object to Judge Roberts' account of the relevant facts, only his legal analyses and conclusions based on those facts. The Court therefore incorporates Judge Roberts' findings of facts in the R&R as if fully set forth here. (Doc. 72, at 3–6). When relevant, the Court will rely on and discuss the facts in conjunction with its de novo review of the legal issues.

### A. Defendant's Invocation of the Public Duty Doctrine

Defendant begins by invoking the so-called "public duty doctrine" for the proposition that "government officials, including police officers, absent a special relationship, do not owe a specific duty of care to individual members of the public." (Doc. 80, at 3). Defendant cites numerous cases in support of this proposition, including *South v. Maryland*, 59 U.S. 396 (1855), *Warren v. District of Columbia*, 444 A.2d 1 (D.C. 1981), *Castle Rock v. Gonzalez*, 545 U.S. 748 (2005), *Blazek v. City of Nevada*, 939 N.W.2d 123 (Iowa Ct. App. 2019), and this Court's opinion in *Close v. City of Bellevue*, No. 24-CV-1012-CJW-KEM, 756 F. Supp. 3d 691 (N.D. Iowa 2024). Defendant then asserts that "[w]ithout the wellness check, police would have not been on the property" on the night in question. (Doc. 80, at 5). Defendant's theory seems to be that the public duty doctrine *prohibited* police officers from conducting a wellness check because they did not owe a specific duty of care to individual members of the public; and he implies that the officers' conduct would have been justified only if they were rendering emergency assistance to someone injured or protecting someone from imminent injury. (*Id.*).

Defendant misunderstands and misplaces reliance upon the public duty doctrine. Generally speaking, the public duty doctrine bars lawsuits against government officials, such as police officers, when the lawsuit is based on "the allegation [of] a government failure to adequately enforce criminal or regulatory laws for the benefit of the general public." *Ochoa ex rel. Maldonado v. City of Sibley*, 58 F.4th 1017, 1021–22 (8th Cir. 2023) (internal quotation marks omitted) (explaining the public duty doctrine under Iowa law). That doctrine has no application whatsoever here. A police officer is not facing a lawsuit here. Officers were responding to a call from B.H. requesting a welfare check of her daughter, T.H., whom B.H. believed was being held against her will by defendant at the Property.

4

The Supreme Court has unanimously recognized that "'the role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.'" *Caniglia v. Storm*, 593 U.S. 194, 199–200 (2021) (Roberts, C.J., concurring) (alteration omitted) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006)). Here, by approaching the Property and knocking on the door of Unit A to carry out the wellness check for T.H., police officers were merely executing one of "the many police tasks that go beyond criminal law enforcement"—tasks which "vary widely" and may include "any non-law-enforcement work that a community chooses to assign," such as a wellness check on a community member. *Id.* at 200 (Alito, J., concurring). The fact that police officers here were carrying out basic tasks typical of police officers is not legally objectionable. *Cf. id.* at 198 (quoting *Florida v. Jardines*, 589 U.S. 1, 8 (2013)) (explaining police officers "may generally take actions that 'any private citizen might do' without fear of liability," such as approaching a home and knocking on the front door).

The only conceivable scenario in which the public duty doctrine might have application here would be if, in an alternate universe, police officers had *not* conducted the wellness check and then faced a lawsuit alleging they *should have* conducted the wellness check, in which case the officers might, in theory, assert the public duty doctrine as a defense, contending they were not legally required to conduct such a wellness check. Again, that is certainly not the case here. Defendant's objection is accordingly overruled to the extent he argues the public duty doctrine is relevant to the analysis of his motion.

### B. Defendant's Objections Regarding Franks *and Scope of the Search*

Defendant maintains he is entitled to a *Franks* hearing, and he objects to Judge Roberts' conclusion to the contrary. (Doc. 80, at 6). Construing defendant's briefing liberally, he appears to argue that Sgt. Paulsen's affidavit in support of the search warrant application contained a significant falsity due to its mention of T.H.'s indication that "there was 'trafficking' occurring" at the Property, which was followed by mention of defendant's criminal history regarding his possession of controlled substances—the

5

purported falsity arising from the contextual inference that "trafficking" here apparently meant "drug trafficking." (Doc. 54-1, at 5). According to defendant, T.H. was talking about sex trafficking, not drug trafficking. (Doc. 80, at 6). Absent this omission—i.e., the omission that "trafficking" meant "sex trafficking"—defendant argues the search warrant lacked probable cause insofar as it authorized a search for drug-related contraband and any cellular devices. Defendant places particular emphasis on the cell phones, explaining that the affidavit's dubious mention of "trafficking" provides the sole basis to authorize a search for cellular devices, as cell phones would be used only in connection with drug trafficking offenses, not firearm offenses, because as defendant puts it, "You can not hide a firearm in a cellphone." (*Id.*, at 7).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), an affidavit in support of a search warrant is presumed valid. *Id.* at 171; *see also United States v. Randle*, 39 F.4th 533, 537 (8th Cir. 2022); *United States v. Hollis*, 245 F.3d 671, 673 (8th Cir. 2001). A defendant is entitled to a hearing under *Franks* when he or she "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155–56; *see also United States v. Hansen*, 27 F.4th 634, 637 (8th Cir. 2022) ("To receive a *Franks* hearing, 'a defendant must make a substantial preliminary showing that there was an intentional or reckless' omission from a warrant affidavit that 'was necessary to the finding of probable cause.'") (quoting *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008)). "This substantiality requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *Hansen*, 27 F.4th at 637 (quoting *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015)). Indeed, "[a] mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. Short*, 2 F.4th

1076, 1080 (8th Cir. 2021) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)).

To make a showing of reckless disregard for the truth, the defendant must show that the affiant "must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information" he or she reported. *United States v. Reed*, 921 F.3d 751, 756 (8th Cir. 2019) (quoting *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015)). "Recklessness can be inferred from [an] omission 'when the material omitted would have been clearly critical to the finding of probable cause.'" *Id.* (quoting *Conant*, 799 F.3d at 1200). If the defendant fails to make "a 'strong initial showing' of deliberate falsehood or reckless disregard for the truth," a *Franks* hearing "must be denied." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

If a defendant can make the requisite preliminary showing to warrant a *Franks* hearing, then at the *Franks* hearing, the defendant must establish: "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining contents is insufficient to establish probable cause." *Conant*, 799 F.3d at 1199 (quoting *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). A similar analysis is employed for omissions. "The defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Conant*, 799 F.3d at 1200 (quoting *Reinholz*, 245 F.3d at 774). "[N]egligence or innocent mistake is not enough to establish a *Franks* violation." *Freeman*, 625 F.3d at 1050–51 (quoting *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010)). Only if the defendant can meet this burden will the "search warrant . . . be voided [under *Franks*] and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Butler*, 594 F.3d at 961.

Here, defendant fails to make the substantial showing necessary under *Franks*. Defendant's argument is based on his reference to government's Exhibit 3, admitted at the suppression hearing, which is an audio interview of T.H. Defendant points out that the only mention of "trafficking" contained in this audio recording is when T.H. states that she believes "sex trafficking" is occurring in connection with the Property. *See* (Doc. 60-2, at 30). Defendant asserts that "[t]he recorded video tape mentions nothing about drug trafficking," (Doc. 80, at 6), and indeed defendant appears to be correct. Yet, these are not the statements of T.H. to which Sgt. Paulsen was referring in his affidavit. They necessarily cannot be. The audio recording contained in Exhibit 3 consists of a conversation mainly between T.H. and Officers Arnold and O'Brien, and although it is not dated, based on its contents it clearly took place sometime after the execution of the September 20, 2024 search warrant, because T.H. discusses with Arnold and O'Brien the details of the encounter at the Property that night.

Furthermore, Sgt. Paulsen's affidavit does not reference any statements made by T.H. to either Arnold or O'Brien. Instead, Sgt. Paulsen states that on September 12, 2024 (i.e., one week before the encounter at the Property), T.H. spoke to a different officer—Officer Clark—and indicated "that the business was not an appliance building and that there was 'trafficking' occurring." (Doc. 54-1, at 5). Defendant's argument thus fails on its premise, i.e., that Sgt. Paulsen's affidavit omitted T.H.'s qualification of "trafficking" as "sex trafficking" based on T.H.'s statement contained in the audio recording. That audio recording did not exist when Sgt. Paulsen authored his affidavit. Sgt. Paulsen is referencing different statements made to a different officer regarding "trafficking." Because defendant has not shown there was an intentional or reckless omission from the warrant affidavit that was necessary to probable cause, defendant's *Franks* argument fails. The Court accordingly overrules defendant's objection on this ground.

8

Also, to the extent defendant argues that the warrant lacked probable cause to authorize a search for drug-related contraband and cellular devices, the Court overrules such an objection. "Probable cause requires a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Kucharo*, 127 F.4th 1152, 1158 (8th Cir. 2025) (quoting *United States v. Espinoza*, 9 F.4th 633, 635 (8th Cir. 2021)). When an affidavit is "based on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant to whether the affidavit provided probable cause to support the search." *United states v. Oliver*, 950 F.3d 556, 564 (8th Cir. 2020) (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)). In *Solomon*, the Eighth Circuit found that when an informant had lived in the same house with the defendant, had seen incriminating physical evidence, and reported it to law enforcement, these facts created "an exceptionally strong basis of knowledge" that evidence would be found in the home. 432 F.3d at 872; *see also United States v. Ellison*, 793 F.2d 942, 946 (8th Cir. 1986) (finding it significant that the informants had lived on the premises and personally observed the reported activity); *Florida v. J.L.*, 529 U.S. 266, 270 (2000) (explaining that "a known informant" is more credible than an anonymous one because the former "can be held responsible if her allegations turn out to be fabricated").

Here, the affidavit shows that Sgt. Paulsen knew T.H. was defendant's girlfriend (as reported by T.H.'s mother, B.H.), that she had been in Unit A prior to the search, and that she had spoken to Officer Clark one week prior and "indicated that the business was not an appliance building and that there was 'trafficking' occurring." (Doc. 54-1, at 5). Sgt. Paulsen corroborated T.H.'s "trafficking" allegation—a description which would be consistent with drug trafficking—with a check of defendant's criminal history, which showed he had multiple charges for possession of controlled substances. *See United States v. Rodriguez*, 711 F.3d 928, 936 (8th Cir. 2013) (quoting *Solomon*, 432 F.3d at 828) ("[I]t is well established that even the corroboration of minor, innocent

9

details can suffice to establish probable cause."). On these bases, the Court has no hesitance concluding that the information contained in Sgt. Paulsen's affidavit provided sufficient probable cause to issue a warrant to search Unit A for evidence relevant to drug trafficking crimes, including drug-related contraband and any cellular devices. *See Solomon*, 432 F.3d at 827 ("When the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.") (cleaned up).[3]

Furthermore, it is not true that the cell phones could only conceivably contain evidence relevant to drug trafficking offenses, nor is it true that the validity of the warrant's authorization to seize any cellular devices must stand or fall based on indicia of probable cause relevant only to drug trafficking offenses. To be sure, as explained above, Sgt. Paulsen's affidavit does indeed give sufficient indicia on which to conclude there is a fair probability that evidence of drug trafficking offenses would be found on any cellular device recovered in Unit A. But even if those indicia were absent, Sgt. Paulsen's affidavit alternatively gives sufficient indicia on which to conclude there is a fair probability that evidence of firearm offenses would be found on any cellular devices

---

[3] The Court notes that two cellphones were recovered when officers executed the search warrant on September 20, 2024. One was found in the "office bedroom area" and the other on defendant's person. The warrant does not provide for a search of defendant's person, but the Court presumes this latter cell phone was seized during a search of his person incident to his lawful arrest that night, which would be permissible under the well-established "search incident to arrest" doctrine. *See Riley v. California*, 573 U.S. 373, 382–85 (recounting the development of the search incident to arrest doctrine); *see also id.* at 401–02 (holding that in order to subsequently search the contents of a cell phone seized incident to a lawful arrest, police officers must obtain a warrant).
Also, in a separate motion, defendant asserts he is entitled to a *Franks* hearing because, in a subsequent application for a state search warrant to search the contents of defendant's two cell phones, Sgt. Paulsen allegedly "omitted . . . material facts from his affidavit." (Doc. 121, at 2). Judge Roberts addressed this issue in a separate report and recommendation. (Doc. 138). The Court will address this issue by separate order.

recovered in Unit A. Evidence relevant to firearm offenses, such as evidence related to the sale, purchase, theft, and possession of firearms, can be and very often is obtained from cell phone data, such as text messages, photos, videos. Sgt. Paulsen's affidavit explains that he observed firsthand defendant wielding a firearm inside Unit A, and that defendant's criminal history indicated he was a convicted felon. This provides probable cause to believe that further evidence relevant to such a firearm offense—independent of any drug trafficking offense—would be found on cellular devices recovered from the very place in which defendant was observed wielding a firearm.

For these reasons, to the extent defendant argues that the warrant lacked probable cause to authorize a search for drug-related contraband and cellular devices, the Court overrules such an objection.

### C. *Defendant's Objection Regarding the Inventory Log*

Defendant next takes issue with the fact that officers transcribed a record of items they found in Unit B—in particular, the firearm—on the inventory log attached to their return of service for the executed search warrant. (Doc. 80, at 7). The search warrant only authorized the search of Unit A, and because the inventory log documents items seized in Unit B, defendant argues, the search warrant was improperly executed, rendering the search unreasonable and requiring suppression of its evidentiary fruits. (*Id.*). This argument lacks substance. Defendant takes issue with the piece of paper on which officers recorded their findings after the search. This trivial bureaucratic detail comes nowhere close to violating defendant's Fourth Amendment right to be free from unreasonable searches and seizures. *See Stuart*, 547 U.S. at 403 ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'"). Defendant's objection on this ground is overruled.

### D. *Defendant's Objection Regarding Standing*

Defendant next objects to Judge Roberts' conclusion that defendant lacks standing to challenge the search of Unit B. (Doc. 80, at 7–8). "Only those with a reasonable

11

expectation of privacy in the place searched may bring a Fourth Amendment challenge."
*United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019). In general, "[a] defendant who 'fails to prove a sufficiently close connection to the relevant places or objects searched has no standing to claim that they were searched illegally.'" *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (alterations omitted) (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)). Factors for determining standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*Id.*

Defendant emphasizes that the factors for determining standing include, as mentioned, "ownership; possession and/or control of the area searched **or item seized**; . . .." (Doc. 80, at 8) (emphasis defendant's). With his emphasis, defendant implies that he has standing to challenge the constitutionality of the search of Unit B, or at least the seizure of the firearm therein, effectively conceding that the firearm was his. Defendant argues that if police officers wished to charge him with possession of a firearm as a felon based on the firearm recovered in Unit B, "they should have returned to the magistrate and seek a more particularized warrant." (Doc. 80). Defendant is mistaken. Defendant had no reasonable expectation of privacy in Unit B. Defendant did not rent Unit B and had no right to access Unit B, and the owner of Unit B gave officers consent to search Unit B. *See United States v. Cross*, 888 F.3d 985, 989 (8th Cir. 2018) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)) ("The general prohibition against warrantless entry into a home does not apply 'to situations in which voluntary consent has been obtained . . . from the individual whose property is searched[.]'"). Because defendant did not have any reasonable expectation of privacy as to the entirety of Unit B, he necessarily cannot have any expectation of privacy as to whatever may be within Unit

B. Here, it is much like police officers had found evidence that incriminates defendant simply lying in the street. Defendant does not have a reasonable expectation of privacy in an item seized in a place where he has no expectation of privacy, regardless of whether he later makes claims to ownership or possession of the item seized. Defendant thus lacks standing to challenge the search of Unit B and the recovery of the firearm within Unit B. Defendant's objection on this ground is accordingly overruled.

> E. *Defendant's Objections Regarding Constitutionality of the Officers' Pre-Warrant Approach to Unit A*

Defendant objects to Judge Roberts' conclusion that the officers did not violate defendant's Fourth Amendment rights when they initially approached Unit A, knocked on the door, and looked through the window and observed defendant wielding a firearm inside. (Doc. 80, at 8–10). In his objection on this ground, defendant purports to have found a winning case, *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978). In *Marshall*, the United States Supreme Court stated that "[t]he Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes," and thus the rule that "warrantless searches are generally unreasonable . . . applies to commercial premises as well as homes." 436 U.S. at 311–12. The Supreme Court explained further that the Fourth Amendment protects against warrantless intrusions not only during criminal investigations, but also during civil investigations, for instance, for breaches of regulatory standards in the business context, in which case a warrant is required "unless some recognized exception to the warrant requirement applies." *Id.* at 313–12.

Although defendant correctly cites the rule of *Marshall*, that rule has no application to the facts here. True, the Fourth Amendment would prohibit an unreasonable warrantless search of Unit A, a commercial premises, just like a home. But officers here did not conduct a warrantless search of Unit A. Rather, they properly obtained a warrant before entering and searching the premises.

The more nuanced and relevant question here is whether the officers needed a warrant to approach Unit A, knock on the door, and then view defendant through a window of the building. This implicates the concept of curtilage. "Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and is typically comprised of land adjoining a house, often within some type of enclosure such as a fence." *United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006) (internal quotation marks and citations omitted); *see also United States v. Mayo*, 615 F. Supp. 3d 914, 920 (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)) ("Curtilage is the area 'immediately surrounding and associated with the home,' which the Supreme Court has held is 'part of the home itself for Fourth Amendment purposes.'"). The question here, then, is whether the concept of curtilage and its protection may extend to a commercial property and its immediately surrounding area.

The United States Supreme Court has not categorically extended the concept of curtilage and its protection to commercial premises. *See Dow Chem. Co. v. United States*, 476 U.S. 227, 239 n.7 (1986) (declining to address issues concerning "business curtilage"). The lack of such a categorical rule makes sense, because as a general principle, "every curtilage determination grows out of its own set of facts." *United States v. Boyster*, 436 F.3d 986, 991 (citing *United States v. Gerard*, 362 F.3d 484, 487 (8th Cir. 2004)). It strikes the Court, though, that the policy underpinnings of the curtilage doctrine render its protection conceptually incongruous with commercial premises, since "[t]he protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 212–13 (1986). In contrast, the Supreme Court has elsewhere explained that "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home," which gives

14

government officials "greater latitude" to inspect commercial properties. *Dow Chem.*, 476 U.S. at 237–38 (quoting *Donovan v. Dewey*, 452 U.S. 594, 598–99 (1981)).

Assuming that there nevertheless could, in theory, be such a thing as business curtilage, it does not apply to the facts here. The fact-specific determination of whether an area enjoys the Fourth Amendment protection afforded to curtilage must be resolved "with particular reference to four factors: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by." *United States v. Wells*, 648 U.S. 671, 677 (8th Cir. 2011) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)).

Here, none of the enumerated factors suggest that the officers invaded the curtilage of Unit A when they approached the front door, knocked, and then observed defendant through the building's window. The government admitted photos of Unit A at the suppression hearing as government's Exhibit 2. (Doc. 51-2). It is obvious from these photos that the area surrounding this commercial property, which is apparently an appliance shop operated by defendant, has absolutely no connection, physical or conceptual, to anyone's home. The area is not enclosed. It is clearly put to commercial use. And the occupant of the building has not taken any steps to protect the surrounding area from observation by people passing by, as the door and windows are clearly visible from the street. In defendant's supplement to his Objections, he includes a photo apparently taken from inside the Property, showing a bed and a window with blinds drawn. (Doc. 122, at 3). He also states that a sign on the other side of the window stated, in big words, "Sorry we are closed." (*Id.*, at 2). He argues that these things show his "full attempt in excluding the public and also to show this area is only used for domestic purposes[.]" (*Id.*, at 1). Defendant's attempt to analogize this to a home is unconvincing. Simply placing a bed inside a commercial building does not afford

15

curtilage protection to the surrounding area outside the building. In short, when the officers approached Unit A, knocked on the front door, and then observed defendant through the building's window, they were not invading any curtilage. *See United States v. McKenzie*, 13 F.4th 223, 232–34 (2nd Cir. 2021) (concluding that a commercial storage unit did not have curtilage and "[e]ven accepting that [defendant] had a reasonable expectation of privacy in the *internal* area of [the unit], he did not have a reasonable expectation in the air *outside* of [the unit]") (emphases in original); *see also Caniglia*, 593 U.S. at 198 ("And of course, officers may generally take actions that 'any private citizen might do' without fear of liability. *E.g.*, *Jardines*, 569 U.S. at 8, 133 S. Ct. 1409 (approaching a home and knocking on the front door).").

Defendant goes on to theorize and fret about the practical implications of the conclusion that police officers were legally present at Unit A conducting a wellness check, knocking on the door, and observing him through the window, all while he, a felon, is prohibited from possessing a firearm. Defendant states, "Imagine if there were actual people peeping inside the window at 11:00 p.m. because they were trying to hurt the Defendant." (Doc. 80, at 9). Defendant explains that "because he is labeled a felon, he would just have to fight off the would be robbers who had guns with his 911 call." (*Id.*, at 10). He continues, "It would be absurd to say a business owner cannot defend or protect his property because it is not his home. Has the government gone so far to no longer protect the [Second Amendment] rights of the people if they are labeled a felon?" (*Id.*). The answer to defendant's question is yes, with the caveat that the Constitution never protected the right to bear arms for convicted felons to begin with. The history and tradition of this country includes "longstanding prohibitions on the possession of firearms by felons." *United States v. Jackson*, 110 F.4th 1120, 1125 (8th Cir. 2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The Second Amendment right to bear arms therefore does not extend to convicted felons. *See id.* at 1129.

16

Case 1:24-cr-00094-CJW-MAR    Document 149    Filed 06/17/25    Page 16 of 20

For these reasons, the Court finds the officers did not violate defendant's Fourth Amendment rights when they initially approached Unit A, knocked on the door, and looked through the window and observed defendant wielding a firearm inside. Defendant's objections on this ground are accordingly overruled.

### F. Defendant's Objections Regarding the Leon *Good Faith Exception*

Defendant objects to Judge Roberts' alternative conclusion that even if police officers acted unconstitutionally when they observed him through the window of Unit A, the subsequent search of Unit A pursuant to the warrant was justified by the *Leon* good faith exception to the Fourth Amendment's probable cause requirement.

"The ordinary sanction for police violation of Fourth Amendment limitations has long been suppression of the evidentiary fruits of the transgression." *United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011). Yet, the so-called "good faith exception" to this exclusionary rule, first announced by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897, 920 (1984), applies when "it was objectively reasonable for the officer executing [a] warrant to have relied in good faith on the issuing judge's determination that probable cause existed," even though that warrant is later deemed invalid. *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (citing *United States v. Jackson*, 848 F.3d 872, 878–79 (8th Cir. 2017)).

"The good faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (internal quotation marks and alteration omitted). In *Proell*, the Eighth Circuit explained that *Leon* identifies four situations where an officer's reliance on a warrant would be unreasonable:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the

> affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (emphasis in original) (internal quotation marks omitted) (citing *Leon*, 468 U.S. at 921; and *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Id.*

Here, defendant contends *Leon* is inapplicable on two grounds. First, he contends the magistrate judge who issued the search warrant was misled, citing *Franks v. Delaware*. (Doc. 80, at 10–11). As the Court explained above, however, defendant has not shown there was an intentional or reckless omission from Sgt. Paulsen's affidavit in support of the September 20, 2024 search warrant. Thus, defendant has not shown the issuing judge was misled, and by extension, defendant has not shown that the officers' reliance on the issuance of the warrant was unreasonable on that basis. Second, defendant contends the issuing magistrate judge abandoned the role of a neutral and detached judicial officer because the magistrate judge issued a warrant knowing officers looked through the window of Unit A to form the basis for the affidavit, implying that the

18

magistrate judge should have known that the warrant was premised on a Fourth Amendment violation. (*Id.*, at 11). As the Court explained above, however, there was no Fourth Amendment violation when officers initially approached Unit A, knocked on the door, and looked through the window. Furthermore, even if this legal conclusion were overturned on appeal and the search instead deemed illegal, the Court finds the illegality of the search would be far from being so obvious that the issuing magistrate abandoned the neutral judicial role by issuing the warrant. Thus, defendant has not shown that the issuing judge abandoned their role in issuing the warrant, and by extension, defendant has not shown that the officers' reliance on the issuance of the warrant was unreasonable on that basis. Accordingly, even if police officers acted unconstitutionally when they observed him through the window of Unit A, the subsequent search of Unit A pursuant to the warrant was justified by the *Leon* good faith exception to the Fourth Amendment's probable cause requirement. Defendant's objections on this ground are overruled.

### G. *Defendant's Argument Regarding His Arrest*

Finally, defendant mentions that there is no evidence that police officers knew of his status as a convicted felon prior to coming to the Property, a fact which they only learned after running a background check on him subsequent to his arrest that night. Thus, defendant argues, police seized his person without probable cause. (Doc. 80, at 11). Presumably, then, defendant seeks to suppress evidentiary fruits of this seizure, i.e., one of the two cell phones. This appears to be a new argument, not raised in his suppression motion. It is meritless. "Police officers have probable cause to make a warrantless arrest if they have information that would lead a reasonable person to believe a crime has been committed." *United States v. Franklin*, 362 F. App'x 571, 573 (8th Cir. 2010) (citing *United States v. Caves*, 890 F.2d 87, 93 (8th Cir. 1989)). Here, officers were responding to a call from B.H., who told officers she believed her daughter was being held against her will by defendant at the Property. When officers knocked on

19

the door of Unit A, they observed defendant wielding a firearm. Police officers had ample cause at that point to believe defendant had committed a crime, justifying his arrest. The fact that police subsequently learned of his status as a convicted felon is irrelevant to the analysis and does not change this conclusion.

## IV. CONCLUSION

For these reasons, the Court **adopts** Judge Roberts' R&R. (Doc. 72). Defendant's Objections (Doc. 80) are **overruled** and defendant's Motion to Quash the Arrest and Suppress Evidence Resulting from Execution of Search Warrant (Doc. 50) is **denied**.

**IT IS SO ORDERED** this 17th day of June, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa